15-3043 Good morning, Your Honors. May it please the Court, I'll assist on behalf of the United States. And before I begin, may I reserve three minutes for rebuttal? Very well. May I proceed, Your Honors? This is the government's second appeal from a sentence that was imposed on David Paul Musgrave by the Southern District Court in Southern District of Ohio. Mr. Musgrave was convicted by a jury of four serious felonies arising out of a $1.7 billion amount. After his initial convictions and first sentencing, the District Court imposed what this panel initially described as effectively a non-custodial sentence. Mr. Musgrave received one day in prison, and to be quite clear, he did not actually serve any time in prison but received credit for the data processing. He was placed on supervised release. How much of a fine did he get in the first sentence? There was no fine imposed in the first sentence, Your Honor, and was ordered to pay restitution of approximately $1.7 billion. As this Court is aware, the government appealed that sentence, and the previous panel vacated and remanded for resentencing, identifying several errors in the District Court's judgment. Namely, the District Court's reliance on the collateral consequences of Mr. Musgrave's prosecution, as well as the District Court's failure to consider the need for general deterrence, especially in white-collar cases. Wasn't the instruction of Musgrave I to offer an explanation? Well, it was to offer an explanation, certainly, but it was also to conduct a plenary resentencing, which is what happened. We had a lengthy resentencing in December of 2014 before Judge Black in this case. Would the ultimate instruction be to explain how that sentence, nevertheless, affords adequate general deterrence? So your position has to be that they did not satisfy that instruction. That's correct, and that's the position that the government advanced in its briefs, is that even after the resentencing, the explanation that Judge Black provides and the sentence that he ultimately imposed still does not provide general deterrence. In fact, that would be one of the three major errors that I want to focus on this morning. Let me just ask the gentleman, does the United States Attorney's Office have an obligation to see that general deterrence is imposed? Well, it's a requirement under Section 3553. No, I understand 3553, but as a prosecutor, do you also have a similar obligation? Yes, when I advocate for a sentence as a prosecutor. How do you justify the arguments about Musgrove when the treatment you've given Goldberg, who Judge Black found was significantly more culpable, you give him a get-out-of-jail-free card? Well, there are a couple of responses to that, Judge Quinn. First, the United States has never agreed with Judge Black's assessment that Mr. Goldberg was more culpable than Mr. Musgrove. It dealt with a million-and-a-half line of credit, right? And $900,000 was applied towards by HSBC against a loan that Goldberg had earlier defaulted on, right? That's correct. And there were $600,000 that had been left in that line of credit, right? Yes, and my understanding is that Mr. – if I recall the testimony, Mr. Goldberg applied that money to other creditors. His creditors. His creditors, right? Correct. So who benefited by the – actually, by the whole million-and-a-half? Well, a couple of responses to that. I'm responsible. I'm going to name Judge Strange on this point. A couple of responses on that. First, it is true that the money went to Goldberg indirectly. But it's also true that Goldberg had sent engineers over to Dayton, Ohio, where the plant was being built after the funds had been transmitted. And there's every indication that the parties had intended to build the plant. That's the first thing. The second – But Goldberg – it's probably a surprise to Goldberg that HSBC takes the $900,000. It is a surprise to Goldberg. He did not expect that. I'm sorry? Do we know if he had personally co-signed on that $900,000 obligation to HSBC? I don't think there was any testimony that came out at trial with respect to his loan obligation with respect to the altering HSBC debt. I think what's problematic with the district was –  Certainly, Your Honor. How much out of this fraud did Musgrove personally receive? How much did he either pay down past debts, or how much did he put in his pocket from the fraud? The government has never taken the position that this was sort of an investment. In contrast, how much did Goldberg benefit from the fraud? Well, the money went to Goldberg's creditors. So Goldberg benefits a million and a half. Musgrove benefits not at all. In terms of just punishment or effective deterrence, isn't that important? It's certainly a consideration, and it was certainly – as I was the one who argued the second – the remand sentence. It was one of the factors that the government considered in recommending a below-guideline sentence in this case. But there are other factors that cut the other way, and quite candidly, Judge Black ignored those other factors. In the first instance, Goldberg, unlike Musgrove, completely cooperated in this case and provided the government's key testimony at trial. Both Mr. Musgrove and Mr. Goldberg had an opportunity to testify on the stand, and the jury was able to assess the relative credibility of Mr. Goldberg. Well, it sounds like you're saying that because Musgrove exercised his right to go to trial, he needs prison time, whereas Goldberg should – you never even convicted Goldberg of the fraud, did you? He gained some misprison charge. I believe our office's part of the agreement was misprisonment, and I only asked for that judge to win. But to be quite clear, the government is not suggesting that Mr. Musgrove is being punished for going to trial. Isn't that what you just said? You said that you gave Goldberg all this benefit because he didn't go to trial, but Musgrove should get a long sentence because he didn't cooperate. No, Your Honor. What I said is Mr. Goldberg benefits because of his cooperation, and it's well established in our system that the government and the judiciary… Well, it was more than a 5K, wasn't it? Well, I don't think it was a formal 5K, but it would have been. You charged him with misprison. Our office did. That's true, and it was effectively a 5K, and there may have been other reasons for that. I believe it's because he was an Australian citizen, and that may have played a role in – excuse me, Judge, in the charging decision. But there is no punishment for Mr. Musgrove exercising his right to go to trial. The benefit to Goldberg – and he was a substantial cooperator. We didn't file a 5K, but his cooperation would exceed that in my experience. Isn't that even better than a 5K to just charge him with a lower – a misprison? What's the statutory maximum? Three years on misprison felony. So going back to whether there was general deterrence, in this case, he's given – on the second day, he's given a $250,000 fine. Correct, Your Honor. And I think – before I turn to the fine specifically, I think the important fact to keep in mind is whether or not the sentence that was imposed in this case with respect to Mr. Musgrove is substantively reasonable when you look at the 3553A factors. Okay, so he's given what – how much is he given in – how much into the first sentence was he required to pay in restitution? They were both jointly and severally liable for the 1.7 million dollars. Okay, and what was the payment plan under the first sentence? There was – I don't recall, but it was very minor, and I think – What was the repayment obligation under the second? The district court judge attempted to impose an accelerated payment plan. And $2,500 a month, right? I believe so, but the accelerated payment plan has sort of been put in the state – And that's $25,000 a quarter. That's correct, Your Honor. Was that all given in the first sentence? No, that was – that was – I don't believe so, Your Honor, because ultimately he had the responsibility of paying the $1.7 million back in restitution. The home confinement for two years, that's not – I mean, isn't that something that would deter a white-collar criminal? I don't think so, Your Honor, because, candidly, Mr. Musgrove gets to live in his half-million-dollar house. He gets to live with his family. Why didn't you go to execute on that? Isn't that separate? I mean, you should – why didn't you go and try to execute on that? Well, Your Honor, we haven't actually litigated the restitution issue, and it's possible that there could be a fraudulent transfer or some other reason. Well, if there is, why – that's something that's in your control, isn't it? Well, Your Honor, that's all speculative, and with respect to if the court is suggesting that there was a possible forfeiture theory, we couldn't show that the house was purchased with proceeds from the client. You sold the proceeds. I'm sorry? Because Mr. Musgrove did not receive proceeds. Well, he didn't receive proceeds, and they're not substitute assets. I think – Well, but you sold the right to get the restitution enforced, and if he had some equitable interest in the house, why don't you go and execute on that? We certainly could, but what happened is that we appealed the first sentence, and then it was reversed and vacated, and we then didn't know what was going to happen the second time around. The district court imposed, again, effectively a non-custodial sentence, and we're appealing. Now, the restitution issue has sort of been set to the side pending resolution of this appeal. So Judge Coyne, it is possible that the – Why would it be set aside? Why didn't you go and try to enforce on the house? His payment terms and the restitution issues have been effectively stayed pending the resolution of this appeal. What do you mean effectively stayed? Is there some order saying that you can't go and seek restitution from the house? Well, his accelerated payment plans have been stayed, and so theoretically by the district court. But isn't the question what the sentence was? Yes. Ultimately, it's what the sentence was. We don't say whether he failed or succeeded. The question is whether the new sentence was distinct from the old sentence and was appropriately explained by the court. Well, that's only one part of it, Judge Strange. Not only was it appropriately explained, that would go more towards the procedural reasonableness of the sentence. And the government has never taken the position that Judge Black didn't provide what he believed was a thorough explanation. That's what the Musgrave I court said. Certainly. So based on what you appealed and what you won, the instruction was come back and explain your sentence. And re-sentence. And I'm struggling with why both wasn't done. Your Honor, I don't think the mandate was limited in that fashion. It wasn't simply that the issue was that in Musgrave I it was procedurally unreasonable to provide an explanation and will affirm the sentence. We had a plenary re-sentencing. The district court imposed a new sentence, and we're appealing the substantive reasonableness of that sentence. And so the question on this appeal is whether or not an effectively non-custodial sentence, a $1.7 million fraud, is substantively reasonable. And a $250,000 fine and two years of home confinement. Correct. And in this line and in this line, too, and in Robinson and what Judge Griffin recently sat on, those additional conditions such as adding home confinement or linking supervised release did not provide a sufficient general deterrent effect. In those cases. In those cases. And, Rand, there are chaperonarchy cases, but this court in Davis and in Petbo have both said very clearly that sentences that are effectively one day or non-custodial in white-collar frauds of this nature are not deterrent. And I agree with Judge Nguyen. Mr. Gover did, in fact, arguably benefit greater than Mr. Musgrave. But that doesn't undermine the fact that Mr. Musgrave was the one that dealt with the bank, submitted the fraudulent documents, concealed Mr. Gover's ownership interest from the bank. If Mr. Musgrave had not done any of those things, there would be no fraud, there would be no loss to the bank, and no loss to the Small Business Administration. Basically, what the judge's sentence here does is it gives him a slap on the wrist. Yes, you committed fraud. He's a sophisticated businessman who has over 20 years of experience. He worked with two gentlemen, Mr. Mercer and Mr. Kirk. Mr. Mercer and Mr. Kirk went over to Australia, did due diligence on Mr. Gover's plan. They contacted other operators to whom Mr. Gover had sold. There was no indication that this was a fraudulent scheme or that Mr. Gover was seeking to defraud Mr. Musgrave. Yeah, well, exactly. Oh, I'm sorry, Judge. Does that help you? I'm sorry? Or did that hurt you? No, I don't think so. I think what it is is the district court ignored the wrongdoing and the wrongful conduct on the part of Mr. Musgrave and focused solely on Mr. Gover's conduct while not giving him any credit for his cooperation. So, on general deterrence or on disparity, we generally compare it with similarly situated defendants across the country. Correct, exactly. I'm sorry, Judge. Can we still consider the way you treated Gover as something that's important in terms of whether it was substantively unreasonable? Under Stimmings, it is correct that this court allows district courts to look at co-defendant disparities, so to speak. How is it possible for the U.S. Attorney's Office to argue that it was substantively unreasonable given your treatment of a guy who was more culpable? That – I don't agree with that. We'd never agree with that contention as more culpable. He got a million and a half dollars that was either given to him or applied against his own personal debts. How is he not culpable? But the culpability goes to the commission of the fraud, and the commission of the fraud was Mr. Musgrave in the first instance. Mr. Musgrave is the one who recommended isolating and concealing the fact that Mr. Gover was on both sides of the transaction. That was an email from Mr. Gover – I'm sorry, from Mr. Musgrave to Mr. Gover. Didn't Gover sign the sheet saying that all the equipment had been shipped? At the request of Mr. Musgrave. So Gover was at least as culpable. Correct, and he planned – And that was the lynchpin for the fraud being carried out. Well, the lynchpin and the fraud being carried out is Mr. Musgrave's misrepresentation to the bank. But the bank wouldn't have shipped the money unless they got notice from Gover that all the equipment was on the boat. Well, they would have approved the loan in the first instance had Mr. Musgrave – So Gover was key to the whole crime scene. So was Mr. Musgrave. Mr. Musgrave was the central fraud. You're wrong. Correct. And so what – I'm sorry if that's strange. I didn't mean to interrupt. And so what sentence did Mr. Gover get? He got a probationary sentence of three years. So where is he living? He voluntarily removed himself. And he went home. Correct. So explain to me if we're talking about people who have equal culpability. The guy who got the money paid to his debts is at home, and your objection here is that the other defendant is confined – confined, not just going home, but confined for two years of home arrest. Help me understand your argument. Well, two things. First, I think it's important to recall that the disparity issue is not limited to simply co-defendant disparity issues. But you get to consider co-defendant. You get to consider co-defendant. So I'm asking you about the co-defendant. Your real objection was that Mr. Musgrave has home arrest. He has to be at home for two years. Mr. Gover, at the behest of your office, was allowed to go home, period. I think the biggest differentiator between the two is the level of cooperation that Mr. Gover came in. Mr. Gover came in, accepted responsibility, testified substantially. And it is not unusual that two defendants who are equally culpable, one gets less responsibility. But under the guidelines, though, you get three levels for acceptance and responsibility. You don't get a get-out-of-jail-free card. But, Judge Gwinn, I think that severely understates actually what happens here. He didn't simply come in and plead guilty. He substantially cooperated.  And persons who proceed to engage in substantial cooperation, and I grant you there was no formal 5K filed in this case, do get significant benefits under our system. Otherwise, it turns the purpose of cooperation— Makes it harder for prosecutors, right? If we can't punish people who go to trial and we can't benefit people, we'll flip early. But that—I hate to go back to this, Judge Gwinn, but I disagree. Mr. Musgrove is not being punished for going to trial. Mr. Gover is being rewarded for his substantial level of cooperation. Isn't that the image of what you're saying? Your Honor, that's—the system has always rewarded cooperators, and we encourage cooperation. We encourage cooperation. Because he did—I mean, in terms of how important Goldberg was, I mean, he had most of this documentary evidence irrespective of Goldberg. I don't agree with that characterization, Judge Gwinn. He has already had Musgrove going in and giving the whole history of the issue when he was complaining about Goldberg being a thief. Well— He's the one who raised it. Well, Mr. Musgrove— Mr. Musgrove reported it. Is that not correct? Right, but as— Anyway, Musgrove went to the FBI. Well, as we've argued in our—and as I argued in my initial sentencing memorandum, it's clear that what Mr. Musgrove represented and Mr. Hansen represented to the FBI turned out to be lies. And indeed, because he lied to both Mr. Hansen and the FBI, that's why a prosecution was brought against Mr. Musgrove as well as Mr. Goldberg. I don't want to—I understand—I don't want to step away from the court's questions. I'm going to turn this way over to your questions. You've got three minutes for a rebuttal. You can save or use it right now. I will—I'll just save for a rebuttal. Thank you. May it please the court, Christian Grostick on behalf of Mr. Musgrove in this case. This is the second time we've been here in this case. In the first, this court instructed the district court to do two things, to resentence Mr. Musgrove without considering the collateral consequences of his conviction and to adequately explain how his new sentence afforded adequate general deterrence. He did so. He held an exhaustive sentence in the hearing of six hours where he took evidence. He made putil factual findings based on that hearing and on his observations of the seven-day trial in the first sentence in the hearing. And he delivered a new sentence. He didn't consider the collateral consequences of the conviction. There's actually no argument about that. And he not only explained how his sentence satisfied the need for general deterrence, but he actually added extra time onto the sentence, added extra conditions that afforded additional deterrence. This court's instruction didn't direct the district court, he must impose a more severe sentence, but he did. It's quite clear he took this court's instructions to heart and he considered general deterrence. He concluded that a more severe sentence was appropriate and necessary to meet that factor, and he did so. And he explained it thoroughly. And we're here on abuse of discretion review, which is made very clear in Gall v. the United States, out of the U.S. Supreme Court, where they both state the standard of review but go a little further. They say that we start with deference to the district court's decision that the factors in this case justify the sentence that he imposed. And they go through explaining why. They say he's in a better position because he's more familiar with the facts of the case, the individual defendant in front of him, and even things like his experience in other cases. Gall instructs that the district courts handle more sentencing than the courts of appeals. And as a result, they're more familiar with the need both for what is appropriate in that individual case and the need to fit this in, in the sense of unwarranted disparities with other cases. And so the district court did those things. He started – well, started – I mean, one way to start here, we could start at a lot of different spots. But the district court noted that across the country, about 25 to 30 percent of white-collar fraud defendants get a sentence of – it's actually less than one month in prison, but no time in prison under the sentencing of subsistence. And approximately 10 percent of that group – not 10 percent of that group, but 10 out of that 25 to 30 – end up with a sentence of some home confinement. And even if we include only white-collar frauds over a million dollars, we're looking at a number about 12 percent. So we're looking at, is this one of the cases, those one out of four cases, if we're looking at all of them together, or one out of eight, one out of nine cases, if we're looking at just over a million dollars, where this type of sentence might be appropriate? I mean, doesn't that show – I mean, I think what's underlying this is the government's policy of disagreement with the district courts in ignoring the sentencing guidelines for white-collar crimes. That the district judges normally apply the guidelines if it's not a white-collar crime. But for white criminals, the guidelines are thrown out, and hardly anyone ever goes to jail or to prison time. I think that's kind of what's underlying this. And your argument that only 12 percent of the people convicted of white-collar crimes go to prison or go to confinement, I think probably supports our argument that there's widespread practice of ignoring the guidelines for white-collar crimes. And this court ought to take a stand on that. The guidelines mean something. I need to say two things in response. The first is that 12 percent number I cited is the opposite. That's 12 percent that don't receive prison time of frauds over a million dollars. So 88 percent of defendants do receive some prison time, at least. And that's just the broad approach. The second is, it's true that in white-collar cases, more so than other cases, district courts vary downward from the guidelines. That's established in the sentencing statistics. It's also true that after Kimbrough, which was involved in the crack cocaine guideline, district courts have authority to vary downward for virtually any reason, and that the white-collar guidelines are specific. They fit into the category that Kimbrough specifically addressed. This is discussed both in the Corsi case we cited out of the Second Circuit and then in the study that we attached to our sentencing memo by Mark Allenbaugh regarding the sentencing statistics nationwide. And what they show, first of all, from Corsi and Kimbrough, is that these are guidelines that weren't developed in the way that was designed to give deference to me, empirically examining the practice of district courts. Now, part of that is… On the basis of loss. That's right. The problematic category is determining sentence based on the amount of money that was lost. That's right. That empirical basis. That's exactly right. And the difficulty there, of course, is in a white-collar case, it's difficult to determine, let's say empirically, with something that's easily observable, what is the egregiousness of this conduct? So loss is a nice thing to hold on to. And typically… It's true. Typically, if there's a greater loss, there'll be a more egregious conduct. But not universally. And this is a good example of that case, actually, where we have Mr. Musgrave, who was… There's no dispute he was trying to start a business. This wasn't a Ponzi scheme or anything like that where he set out to steal money from people to line his own pockets. And yet the loss… If we focus only on loss amount, we would call him the exact same egregiousness as someone in a similar position. And the district court examined the factors and said, no, this is a reason to go downward. And I should add, both the government and the probation office independently reached the same conclusion. Nobody here was asking for a within-guideline sentence. I have a question on the record. When we're talking about these two, one defendant, Mr. Musgrave, and Goldberg, my memory of the record is that though Musgrave did not know it, that there was a determination after either a trial or sometime in the record that indicated that Goldberg had, in fact, been involved in attempting to sell this same sort of equipment to, I think, nine businesses, all of which had failed. That's correct. That was listed in a trial that this was the eighth or ninth. Tire recycling plant, which he advertised to sell as a turnkey, right? Everything's there. You can just start it up. So if we're comparing these two people involved in the same thing, we have not only the list of distinctions that Judge Wynn walked through to show the difference in the result, the difference in the punishment, but we also have different preceding facts regarding the culpability or propriety of the people who are now standing before even with their sentence or cutting the deal. That's correct. That's correct. And the district court explained that thoroughly at pages 144 to 45 and then 154 to 56 of the sentencing. So there's evidence in the record that Goldberg was, in fact, previously a bad actor. Yes. Yes, absolutely. That's in the trial transcript. And this is one of those facts also where we are on an abuse of discretion review. So although I understand the government says their position is Goldberg was not more culpable than Musgrave, the district court thoroughly explained why we found that he was. And the government's never taken the position that that was an abuse of discretion or at least hasn't stated it that way. They've suggested that they disagree, but that's simply not enough. I'm reading now. And under this court's decision in Presley, for example, where this court affirmed a 241th downward variance based solely, that was the only factor identified, on the relative disparity between the potential relative disparity between co-defendants. And in Gall, also, where the Supreme Court was examining Mr. Gall's sentence, which was three years probation, Mr. Gall, a co-defendant, received 30 months and upward in prison. And the court said, not only is that proper, but the district court should take care to avoid unwarranted sentencing similarities. Now, here, and I understand my colleague's argument, and I believe it happened here, which is Mr. Goldberg received a benefit by pleading cooperative, and that's appropriate. There's really no question, based on the district court's analysis of the factors and the comparative culpability, that Mr. Goldberg would have received a significant prison sentence had he not pleaded cooperative. And that would have been appropriate, given their relative culpability. But in the end, Mr. Goldberg, as a result, received a more lenient sentence. And this court, in the United States v. Commissionione, described a comparison between two very similar sentences, actually. A three-year probationary sentence versus a sentence of a longer term of supervised release, a year of home confinement, in that case one year, and a fine. And said that the pure probationary sentence, quote, does not begin to approach the severity of the second sentence. So that's what we have here, is Mr. Goldberg got a substantial benefit. That's appropriate. But it doesn't mean that Mr. Muska must go to prison in order to meet all the sentencing factors. And it doesn't flip the value of cooperation on its head. Gall, and the 3553A factors, and this court, all explain that prison is not the only way to afford general insurance to issue a severe sentence. It can be. And in fact, the Seventh Circuit in the United States v. Turner, citing work of economists, came to the exact same conclusion. Is that how white Gary Becker got the no vote? That's absolutely right. They said economists Gary Becker's work in that case. And that's what the judge said here, is a substantial financial penalty can be an effective deterrent. And in fact, what's Ms. Becker's argument? That's exactly correct. And here the financial penalty is not just the $250,000 fine. But it's on top of the restitution, which, and again, this is considering the factors of this case, the unique facts of this case. It isn't giving back what he received. He's starting with zero. He's actually starting with negative $300,000 because Mr. Goldberg took $300,000 of his own money in the process. Is it realistic, the fine and the restitution will be paid? In full? I'm not certain, honestly. And I shouldn't say honestly. I'm used to it. But I do mean it this time. The other key word is, don't ever say clearly. That's almost a tickler to say, it's probably not so clear. That I understand. What are the chances that he will pay the fine and the restitution? I can't be certain. What I can say now is his two major personal assets are his business interests, which has proven difficult to value. They've been in the sale process right now, honestly, trying to offer it for sale in order to try to meet the salary. But it's an ongoing concern. It is an ongoing concern, yes. And he currently makes $72,000 from that business a year or two. Which, if we extrapolate out, could make a significant dent on its own in the fine and restitution. And then there are questions out there about his potential equitable interests. Now, what were the guidelines for? The guidelines were 57 to 71 months in prison. And the probation office recommended what? 15 months in prison. 15 months. Yes. So one day in substantial areas. It is if we look... What were the guidelines for probation? It is if we look only at the prison sentence. What if the guidelines... What was the recommendation as to the fine under the guidelines? The recommendation... The guidelines range, I think... I'd have to go back and check. I think it's between $100,000 and $1 million in this case. And what did the probation department recommend? They recommended no fine. And I do want to come back to... If we're comparing only prison sentence terms, then that's a substantial variance. But the guidelines count more than just prison. And, in fact, if we look just at the guidelines, the probation office's recommendation falls in an offense level between 12 and 14. 15 months falls in that range. This is an above-guideline sentence for offense level 11. Offense level 11 allows the district court to impose, effectively, probationary sentences to satisfy the full term. But only up to 8 to 14 months. This is 24 months. And then a fine on top of that. So, again, if we're comparing in terms of the guidelines, yes, I can't dispute, and I would not be here to argue, that if we look only at prison, that this is in the same range. It's different. But Gall and the 3515-3A factors and the sentencing guidelines themselves say we don't look just at prison. We look at home confinement, which can be a severe sentence. We look at fines, which can be a severe sentence. And that's what we got here. And the judge thoroughly explained his decision. After sitting through two sentencing hearings and a seven-day trial, and we'd asked him to affirm that sentence, he did what he was supposed to do and what this court instructed him to do. The biggest argument is he did not abuse his discretion. He did not abuse his discretion. I'm not sure I would have done what he did, but he was very careful. He did his best to comply with order of remand. He thoroughly explained it. And I think if I were in his position, I probably would have imposed prison time. But our standard is whether he abused his sentence of discretion, which is a very high standard. That's your best position, is that maybe he could have done something differently, but he didn't abuse his discretion. With that, I think I should sit down and say thank you. Thank you. And proceed. Judge Griff, I'm going to start on your last point. Even though it's an abuse of discretion, it is not a insurmountable appeal. In both Bisline and Robinson, the district court judges there gave extremely long, thorough, detailed explanations as to why they imposed the sentences they did. And the panels in either Bisline 2 or Robinson 2 hesitated in reversing remanding when the ultimate sentence was an abuse of discretion. Thus far, both Judge Black and as has been suggested by the panel, the only factor that supports the sentence that was imposed here is what happened to Mr. Gilbert. In effect, the district court discounted every other aspect of the 3553a factors in determining what was the appropriate and reasonable sentence. Mr. Gilbert's sentence is not the cap. It is not the lodestar to determine what Mr. Musgrave's sentence is. But it's certainly an imperative. It's absolutely a relevant factor, and the government has never taken the position that the district court erred by taking into consideration. But Gall instructs, most importantly, that there must be compelling reasons to justify the variance. And the treatment of Mr. Gilbert alone does not provide a compelling reason. We have a fraud where there's $1.7 million in loss. That's not a hypothetical loss. That's an actual loss. We don't have a case where Mr. Musgrave was dragged into the fraud by Mr. Gilbert. Mr. Musgrave affirmatively, over multiple months, made multiple misrepresentations to both the bank and the small business administration, which resulted in the loss. Aren't most fraud cases one where the defendant has himself benefited? Your Honor, it's true that in most fraud cases, the defendant is trying to benefit. And here, Mr. Musgrave might want to reasonably start business, but he's trying to benefit by getting money in a fraudulent loan. In the fraud purchaser case, it's what we call— And the fraud in this case was the fraud with regard to Gilbert's contribution, not being a cash contribution. Well, there's multiple frauds. There's no cash contribution, Mr. Musgrave claiming that the money came from his own pockets. But most importantly, what Mr. Musgrave did not disclose is the fact that Mr. Gilbert is on both sides of the transaction. And it is irrefutable that if the bank had known that Mr. Gilbert was on both sides of the transaction— Did the bank ever ask him what the principles of the— Yes, they did. It was required in the form. And Mr. Musgrave, in an exhibit that was presented at trial— I apologize for the number, but it's in Series 7, and it's cited in the Statement of Facts— Mr. Musgrave, not Mr. Gilbert, expressly said that it was— that we would isolate Mr. Gilbert's relationship from the bank. And that was understood in order to conceal from the bank that Mr. Gilbert was on both sides of the transaction. One thing I didn't touch upon, which I think is really critical here, outside of the general deterrence factor, is that the District Court's consideration of Mr. Musgrave's restitution obligations was improper. That is inconsistent with case law, both from this circuit, the Sixth Circuit, as well as the Fourth Circuit. Isn't the case law that you suggest dictates that there's no understandable view on that issue, pre-Booker and then after Booker? I don't agree, Your Honor, because what the case—first of all, United States v. Engel, which is from the Fourth Circuit, and it's cited in our brief, cites approvingly that Sixth Circuit case law. And the issue is there that you are not taking into consideration the socioeconomic factors of the defendant in— In 35A53A7, it specifically tells us to consider restitution. Sure, and that's restitution because restitution isn't mandatory under every Title 18 crime. Okay, but that different portion says we're not to consider socioeconomic background. Your Honor, I can't contradict the record. The District Court clearly said that the loss here did not have to be permanent because of Mr. Musgrave's status as an invisible man, and then called his restitution obligations— Your Honor, may I continue? Sure. Compelling. So what Judge Black did is he rewarded Mr. Musgrave for having money. And if Mr. Musgrave was a poor defendant, he would not have gotten that reward. And the government cites at least five cases from the Fourth, Sixth, Eighth, and Seventh Circuits, which all say that the consideration of socioeconomic status in that manner not only raises constitutional suspect— is constitutionally suspect, but it's inconsistent with the guidelines. I mean, he basically rewarded Mr. Musgrave for having a job. Any further questions? Thank you.